IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-118

Filed: 15 December 2020

Pitt County, No. 16 CVS 2868

THOMAS KEITH AND TERESA KEITH, Plaintiffs-Appellees/Cross-Appellants,

v.

HEALTH-PRO HOME CARE SERVICES, INC., Defendant-Appellant/Cross-Appellee.

Appeal by Defendant from order entered 26 March 2018 by Judge Marvin K. Blount in Superior Court, Pitt County. Heard in the Court of Appeals 4 June 2019.

*Ward and Smith, P.A., by Jeremy M. Wilson, Alexander C. Dale, and Christopher S. Edwards, for Plaintiffs-Appellees and Plaintiffs-Cross-Appellants.*

*Hedrick Gardner Kincheloe & Garafalo LLP, by M. Duane Jones, Michael S. Rothrock, and Linda Stephens, for Defendant-Appellant and Defendant-Cross-Appellee.*

McGEE, Chief Judge.

Defendant-Employer Health-Pro Home Care Services, Inc. ("Defendant" or "Health-Pro") appeals from the denial of its motions for directed verdict and its motion for a judgment notwithstanding the verdict ("JNOV") on the negligence claim of Plaintiffs Thomas Keith ("Mr. Keith") and Teresa Keith ("Mrs. Keith," together with Mr. Keith, "Plaintiffs"). Because this Court holds that Plaintiffs' claim was one pursuant to the doctrine of negligent hiring, retention, or supervision, not, as argued

by Plaintiffs, one in ordinary negligence, we agree with Defendant, reverse, and remand for entry of a JNOV in Defendant's favor. We further dismiss Plaintiffs' conditional cross-appeal as moot.

## I. Facts

In relevant part, the substantial evidence introduced at trial supporting Plaintiffs' negligence complaint included the following facts: Defendant "provides in-home health care for disabled and elderly individuals." Plaintiffs "are an elderly couple who live alone at their home in Pitt County[.]" Plaintiffs "hired [Defendant] approximately three years [prior to filing this action] to provide in-home care." "Originally, Health-Pro aides were scheduled to come to [Plaintiffs'] home from 8:00 a.m. to 2:00 p.m. and then again from 6:00 p.m. to 11:00 p.m." However, Plaintiffs "eventually" requested that "Health-Pro aides" provide services "for the entire day." "Health-Pro aides" such as Deitra Clark ("Ms. Clark") would "provide the following services to [Plaintiffs], among others: laundry; retrieving the mail and newspaper; preparing meals; washing, bathing, and dressing Mrs. Keith; cleaning the house; and running various errands for [Plaintiffs], including driving Mrs. Keith to the store and to doctor appointments." Aides such as Ms. Clark were employees of Defendant. Naturally, due to the nature of the job, "[Ms.] Clark was able to gain extensive information about [Plaintiffs] and their home including, but not limited to, how to enter and exit the home, details of [Plaintiffs'] personal property and other assets, and the location of valuables within the home."

"In the fall of 2015, [Plaintiffs] discovered that approximately $90.00 in rolled coins had been stolen from a box inside their home." "In July or August 2016, approximately . . . $1,200.00 was stolen from [Mrs. Keith's] dresser drawer, and $90.00 was stolen from Mr. Keith's wallet." At the time Plaintiffs noticed the missing money in August, they informed "Sylvester Bailey [("Mr. Bailey")], one of the officers and owners of Health-Pro, of the" money missing from Mr. Keith's wallet, the money missing from Mrs. Keith's dresser drawer, as well as the "missing rolled coins" allegedly stolen in "the fall of 2015." In response, "[Mr.] Bailey stated that he would take appropriate action, including determining which employee might be responsible and responding accordingly." "[Mr.] Bailey identified two employees who may have been working for Plaintiffs "in the fall of 2015" as well as "[i]n July or August 2016," one of whom was Ms. Clark, the other Clementine Little ("Ms. Little") and "assured [Plaintiffs] that neither [employee would] again [ ] be assigned to [Plaintiffs'] home. [Plaintiffs and their son, Frederick Keith ("Frederick"),] specifically told [Mr.] Bailey that they did not want [Ms.] Clark assigned as an aide [ ] in their home." However, two or three weeks later, Defendant "again assigned [Ms.] Clark to [work as an aide in Plaintiffs'] home." Plaintiffs allege that because they "relied on Health-Pro aides to take care of them, including to assist with various activities of daily living and to transport Mrs. Keith to the medical appointments," Plaintiffs "essentially were forced to accept aide assignments made by [Defendant]."

Sometime "between 12:00 midnight and 1:00 a.m. on September 29, 2016," Plaintiffs were the victims of "a home invasion [ ] robbery" perpetrated by Ms. Clark and two male accomplices. "[Ms.] Clark [knew the location of] a key to [Plaintiffs'] home which, upon information and belief, was used to enter the home[.]" "The male accomplices forced their way inside [Plaintiffs'] home[ and one of the men] held a gun to Mr. Keith's head. One male accomplice then forced Mr. Keith at gunpoint to drive him to an ATM, where he forced Mr. Keith to withdraw $1,000.00 in cash." "The other male accomplice held Mrs. Keith at the home as a hostage during the time." "In addition to the $1,000.00 in cash, [Ms.] Clark and the two male accomplices stole over $500.00 in coins as well as a gun from [Plaintiffs'] home." Ms. Clark did not enter Plaintiffs' home and, at the time of the robbery and kidnapping, Plaintiffs did not know Ms. Clark was involved.

"Following the robbery, [Ms.] Clark and one of her accomplices went to Wal-Mart, spent some of the money they had stolen from [Plaintiffs], and then tried to 'cash in' the rolled coins. [Ms.] Clark and her two male accomplices were all subsequently arrested." Mr. Bailey's wife Doris Bailey ("Ms. Bailey"), "the director of Health-Pro, came to [Plaintiffs'] home the morning following the robbery. [Ms.] Bailey admitted that [Ms.] Clark was involved in the robbery and as a result was being terminated by [Defendant]. [Ms.] Bailey also revealed that [Defendant] had some prior knowledge of a criminal record concerning [Ms.] Clark."

Plaintiffs included two claims in their complaint—a claim of "negligence," and a claim for "punitive damages." Defendant moved for summary judgment on 7 September 2017, which motion was denied on 12 December 2017. Defendant stipulated before trial that Ms. Clark "was an employee of Defendant . . . on September 29, 2016"—the date of the criminal acts perpetrated against Plaintiffs— and that Ms. Clark "was involved with, and had responsibility for, the . . home invasion and robbery of Plaintiffs[.]" "Plaintiffs' contested issue[ ] to be tried by the jury" was set forth by Plaintiffs as: "Were [ ] Plaintiffs . . . injured by the negligence of Defendant[.]" This matter went to trial on 19 March 2018.

At trial, Defendant objected to the introduction of certain screenshots from Ms. Clark's Facebook page, stating that it was Defendant's "understanding Plaintiffs intend to introduce [the] screenshots . . . [and] argue that [Ms. Clark's Facebook account] was one of the things [ ] *Defendant should have checked when hiring her and also having her as an employee.*" (Emphasis added). Defendant's attorney argued that Ms. Clark posted the contested Facebook posts *while* she was employed by Defendant, *not before*, and that "there is no legal authority which I am aware of that requires perspective employers to utilize social media as a screening tool for job applicants and there's no legal authority which I am aware of that requires a current employer to continually screen an employee's social media account." Plaintiffs argued the Facebook posts were relevant because "Defendants themselves *create a duty two separate ways*. One, they had a *background check policy* that said if there were any

5

sort of charges or even misdemeanors but before someone is hired there needed to be an investigation of exactly what happened" and, two, "these *posts are the one threat* . . . during the time [Ms. Clark] was in [Plaintiffs'] home when money started going missing[.]" (Emphasis added).

After the close of Plaintiffs' evidence, Defendant moved for a directed verdict, arguing that Plaintiffs had failed to introduce sufficient evidence to support a claim for negligent hiring, supervision, or retention,[1] or for punitive damages. Plaintiffs countered that their claim was one based upon "ordinary" negligence, not negligent hiring. The trial court denied Defendant's motion. At the close of all the evidence, Defendant renewed its motion which was again denied. However, the trial court granted Defendant's motion for a directed verdict on Plaintiff's claim for punitive damages.

The trial court instructed the jury, in relevant part, as follows: "W[ere] [ ] Plaintiff[s] . . . injured by the negligence of [ ] Defendant[.]" "This means that [ ] Plaintiff[s'] must prove by the greater weight of the evidence that [ ] Defendant was negligent and that such negligence was a proximate cause of [ ] Plaintiff[s'] injury." "[N]egligence refers to a person's or company's failure to follow a duty of conduct imposed by law. Every person or company is under a duty to use ordinary care to protect himself and others from injury." The trial court instructed that "ordinary

---

[1] For the sake of simplicity, we will sometimes use "negligent hiring" as shorthand for the legal doctrine that includes negligent hiring as well as negligent supervision and negligent retention.

care" meant "that degree of care which a reasonable and prudent person would use under the same or similar circumstances[.]" The trial court defined proximate cause as "a cause which in natural and continuous sequence produces a person's injury and is a cause which a reasonable and prudent person could have foreseen would probably produce such injury or some similar injurious result." The jury found in favor of Plaintiffs, awarded Mr. Keith $500,000.00 in damages, and Mrs. Keith $250,000.00. Defendant moved for a JNOV, which the trial court denied. Defendant appeals, and Plaintiffs include a conditional cross-appeal from the trial court's grant of a directed verdict in favor of Defendant on Plaintiffs' claim for punitive damages.

## II. Analysis

Defendant argues on appeal that the trial court erred in allowing Plaintiffs' action to go to the jury as one in "ordinary" negligence, and in instructing the jury accordingly. Defendant contends Plaintiffs' action should have been submitted to the jury as one based on the doctrine of negligent hiring, supervision, or retention. Defendant further argues that "the trial court erred in denying Defendant's motions for directed verdict" and Defendant's motion for a JNOV, because the evidence was insufficient to support a verdict against Defendant for either ordinary negligence or negligent hiring.

### A. *Standard of Review*

It is well established:

> A motion for directed verdict . . . tests the legal sufficiency of the evidence to take the case to the jury. In ruling on a defendant's motion for directed verdict, the trial court must take plaintiff's evidence as true, considering plaintiff's evidence in the light most favorable to him and giving him the benefit of every reasonable inference. Defendant's motion for a directed verdict should be denied "unless it appears, as a matter of law, that a recovery cannot be had by the plaintiff upon any view of the facts which the evidence reasonably tends to establish." Given these principles it is clear that a defendant in a negligence action is not entitled to a directed verdict unless the plaintiff has failed, as a matter of law, to establish the elements of actionable negligence.

*Little v. Omega Meats I, Inc.*, 171 N.C. App. 583, 586, 615 S.E.2d 45, 47-48, *aff'd per curium*, 360 N.C. 164, 622 S.E.2d 494 (2005).

> A JNOV motion seeks entry of judgment in accordance with the movant's earlier motion for directed verdict, notwithstanding the contrary verdict returned by the jury. *See* G.S. § 1A–1, Rule 50(b). A ruling on such motion is a question of law, and presents for appellate review the identical issue raised by a directed verdict motion, *i.e.*, whether the evidence considered in the light most favorable to the non-movant was sufficient to take the case to the jury and to support a verdict for the non-movant.

*Bahl v. Talford*, 138 N.C. App. 119, 122, 530 S.E.2d 347, 350 (2000) (citations omitted). Therefore, our decision on the trial court's denial of Defendant's motion for a JNOV will also decide Defendant's motions for a directed verdict. However, in order to decide whether the trial court properly denied Defendant's motion for a JNOV, we must first decide whether Plaintiffs' case was appropriately presented to the jury as an "ordinary" negligence claim instead of an action for negligent hiring. We therefore

review the law of this state, and consider the law from other jurisdictions, regarding an employer's liability for torts committed by one of its employees.

B. *Law of Employer Liability for Tortious Acts of Employees*

As noted, Defendant argues in part: "Plaintiffs contend their claims against [Defendant] arise in *[ordinary] common law negligence*, yet their arguments and the evidence they rely on demonstrate that Plaintiffs' claims are for the negligent hiring, supervision, and retention of an employee." (Emphasis added). We first want to clarify that an action for negligent hiring is a "common law" remedy based in negligence. Before the common law development of negligent hiring expanded employer liability for the injuries sustained by third parties due to the negligent acts of employees, the sole common law remedy was to bring an action based upon the well-established doctrine of *respondeat superior*. *Respondeat superior* is not a direct action against the employer based on the employer's negligence, instead, the employer's liability is predicated on establishing (1) agency—the tortfeasor was employed by the employer, and was acting in the course of that employment—and (2) negligence—*the employee's* negligent actions were the proximate cause of the third party's injury and damages.

North Carolina courts have been reticent to impose liability on employers for the acts of their employees. The early cases from our Supreme Court mainly concerned situations where one employee injured another employee, or where an employee injured a customer while acting as the employer's agent in the furtherance

9

of the employer's business interests. The doctrine of negligent hiring was developed and became universally recognized in this country as a common law remedy, developed from common law negligence principles in order to provide relief where the relevant facts of a case precluded recovery pursuant to *respondeat superior*. The doctrine of negligent hiring is a proper cause of action in limited circumstances— when the *negligence of the employer* is the legal proximate cause of its employee's wrongful actions, and the employee's wrongful acts result in damages to a third party.

The common law development of a "new" cause of action for negligent hiring allowed plaintiffs, in certain circumstances, to hold an employer liable for the negligent or intentional acts of its employee, even when the employee was not acting within the scope of employment. Because both negligent hiring and *respondeat superior* are "common law" actions requiring the plaintiff to establish negligence, they are actions in "common law" negligence.[2] Therefore, what is sometimes referred to as "common law" negligence we will refer to as "ordinary" negligence.

As noted by our Supreme Court: "To state a claim for [all theories of] common law negligence, a plaintiff must allege: (1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." *Stein v. Asheville City Bd. Of Educ.*, 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006) (citations omitted.) Judge Cardozo stated in *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (1928), the seminal opinion

---

[2] *Respondeat superior* is based upon both agency and the negligence of the employee, which is an element that must be proven by the plaintiff.

concerning an employer's liability for the acts of its employees: "Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. 'Proof of negligence in the air, so to speak, will not do.' 'Negligence is the absence of care, according to the circumstances.'" *Palsgraf*, 162 N.E. at 99 (citations omitted). In *Palsgraf*, the court recognized that *the existence of the legal duty itself* requires that a reasonable person in the defendant's position would reasonably *foresee* the likelihood that the defendant's act or omission would result in the kind of injury suffered by the plaintiff. "'In every instance, before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which would have averted or avoided the injury.'" *Id.* at 99-100. Citing *Palsgraf*, our Supreme Court noted: "*[T]he threshold question is whether plaintiffs successfully allege [the employer] had a legal duty to avert the attack on [the injured plaintiff]. Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 342-44, 162 N.E. 99, 99-100 (1928)." *Stein*, 360 N.C. at 328, 626 S.E.2d at 267-68 (emphasis added).

Our Supreme Court has adopted the theory of duty as set forth in *Palsgraf* in *Stein*, 360 N.C. at 328, 626 S.E.2d at 267-68, and has recognized the requirement that the plaintiff prove the injury complained of was the foreseeable result of the employer's alleged acts or omissions in order to prove the employer owed the plaintiff a legal duty of care: "*No legal duty* exists unless *the injury* to the plaintiff *was foreseeable* and avoidable through due care." *Stein*, 360 N.C. at 328, 626 S.E.2d at

11

267 (emphasis added) (citations omitted). The Court also noted: "Whether a plaintiff's injuries were foreseeable depends on the facts of the particular case." *Id.* at 328, 626 S.E.2d at 267-68 (citation omitted).

Plaintiffs in this case contend that *respondeat superior* and negligent hiring are simply *alternative* theories, *in addition to* ordinary negligence, by which a plaintiff may sue an employer for the negligent or intentional acts of its employees. Defendant argues on appeal that Plaintiffs' action was in reality an action pursuant to the doctrine of negligent hiring, that the trial court erred in instructing the jury under ordinary negligence instead of negligent hiring, and that Plaintiffs' evidence was insufficient to survive Defendant's motions for directed verdicts and a JNOV under any theory of Defendant's alleged liability for the criminal acts of its employee, Ms. Clark. Plaintiffs contend they only pled "ordinary" negligence, they tried the case as an ordinary negligence claim and, therefore, the trial court properly denied Defendant's negligent hiring instruction and instructed the jury on ordinary negligence. We therefore consider the relevant theories of negligence in the context of the facts of this case—looking to Plaintiffs' complaint and the evidence presented at trial within the context of precedent governing both ordinary negligence and negligent hiring.

### 1. **Plaintiffs' Complaint**

Although Plaintiffs contend they only pled ordinary negligence, the nature of Plaintiffs' cause of action is not controlled by how Plaintiffs labeled it in their

complaint—"*it is not the titular designation that controls*; the nature of the cause of action is determined by the facts alleged." *Burton v. Dixon*, 259 N.C. 473, 477, 131 S.E.2d 27, 30 (1963); *see also, CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 52, 790 S.E.2d 657, 660 (2016). Plaintiffs' complaint properly alleged an employer/employee relationship between Defendant and Ms. Clark, that Ms. Clark was assigned to work at Plaintiffs' home by Defendant, and that Ms. Clark was responsible for the events of 29 September 2016. Plaintiffs further alleged that they "relied on Health-Pro to assign quality aides to their home who would . . . treat [Plaintiffs] properly, and who would not steal or otherwise engage in inappropriate or harmful behavior." Ms. Clark "was able to gain extensive information about [Plaintiffs] and their home including, but not limited to, how to enter and exit the home, details of [Plaintiffs'] personal property and other assets, and the location of valuables within the home[,]" therefore it "was reasonably foreseeable, including to Health-Pro, that [Ms.] Clark would have access to this information as a result of her being assigned to" work in Plaintiffs' home. "In the fall of 2015, [Plaintiffs] discovered that approximately $90.00 in rolled coins had been stolen from a box inside their home." "In July or August 2016, . . . [a]pproximately $1,200.00 was stolen from [Mrs. Keith's] dresser drawer, and $90.00 was stolen from Mr. Keith's wallet." "Mr. Keith [ ] told [Mr.] Bailey of the missing funds. [Mr.] Bailey identified two potential employees whom he suspected, one of whom was [Ms.] Clark[.]" Mr. Bailey "assured [Plaintiffs] that neither [of the two employees] would be assigned to [Plaintiffs']

home" in the future. "Unfortunately, Health-Pro again assigned [Ms.] Clark to [Plaintiffs'] home." Plaintiffs contended that because "they relied on Health-Pro aides to take care of them," they "essentially were forced to accept aide assignments made by Health-Pro." "[Ms.] Clark orchestrated [the 29 September 2016] home invasion and robbery of [Plaintiffs] along with two male accomplices." "[Ms.] Clark and the two male accomplices stole" the $1,000.00 from the ATM, and "over $500.00 in coins as well as a gun[.]"

"[T]he morning following the robbery[,] [Ms.] Bailey admitted that [Ms.] Clark was involved . . . and . . . was being terminated[.] [Ms.] Bailey also revealed that Health-Pro had some prior knowledge of a criminal record concerning [Ms.] Clark." Plaintiffs alleged Ms. Bailey made a public statement "that Health-Pro . . . had conducted an 'extensive background check' on [Ms.] Clark and that the background check was clean." "Upon information and belief, Health-Pro did not perform a criminal background check on [Ms.] Clark before assigning her to [Plaintiffs'] home" but, if it did, "Health-Pro ignored the results in assigning [Ms.] Clark to perform work on behalf of [Plaintiffs]." Plaintiffs alleged Ms. Clark's criminal history prior to 29 September 2016 consisted of the following convictions: "2008: found guilty of driving while license revoked;" "2009: found guilty of possession of drug paraphernalia;" and "2010: found guilty of criminal contempt[.]" Plaintiffs also included charges for which Ms. Clark was not convicted: "2010: charge for possession of drug paraphernalia;" "2010: charge for communicating threats (dismissed because of non-cooperating

witness);" and "2011: charge for communicating threats (dismissed because of non-cooperating witness)."

Plaintiffs stated "upon information and belief, Health-Pro did not perform a driver's license check on [Ms.] Clark before assigning her to work . . . in [Plaintiffs'] home, including to drive [Mrs. Keith.]"  "If Health-Pro did perform a driver's license check on [Ms.] Clark, Health-Pro ignored the results in assigning her to work as an aide in [Plaintiffs'] home," even though Ms. Clark "did not have a valid driver's license."  Plaintiffs further alleged that "[Ms.] Clark also maintained a public Facebook page, which Health-Pro easily could have accessed.  The Facebook page contains several posts further suggesting that [Ms.] Clark should not have been assigned to work as an in-home aide[,]" though "[i]t may have been acceptable for Health-Pro to hire [Ms.] Clark and assign her to another position besides providing in-home care services, such as an 'office only' position."  Plaintiffs concluded that "Health-Pro knew or should have known of [Ms.] Clark's criminal background and lack of a valid driver's license, as well as related facts establishing that [Ms.] Clark should not have been assigned to provide in-home care to [Plaintiffs,]" and "Health-Pro continued to assign [Ms.] Clark to provide in-home care to [Plaintiffs]" despite these facts.

Plaintiffs alleged that Defendant "had a duty to assign employees as aides to [Plaintiffs'] home with reasonable care, including properly screening its employees in order to decide which employees could be assigned to such positions[.]"  Further,

15

>Health-Pro had a duty to not assign [Ms.] Clark to work as an aide providing in-home care on behalf of Health-Pro when it became aware of, or in the exercise of reasonable care should have become aware of, [Ms.] Clark's criminal record and driving record, as well as any other pertinent facts associated with her background or her actions on behalf of Health-Pro, including any inappropriate behavior, theft, or other concerns.

Plaintiffs then alleged that Defendant "carelessly and heedlessly was negligent in that it:" "failed to adopt and/or properly implement and enforce appropriate company policies regarding criminal background and driving record checks for employees . . . that would be assigned to work as in-home aides;" knew of Ms. Clark's unfitness to work as an in-home aide, or "failed to investigate and become aware of [Ms.] Clark's criminal background and driving record, including her lack of a driver's license, as well as other pertinent facts regarding her background before assigning her to work as an in-home aide;" "continued to assign [Ms.] Clark to provide in-home care to [Plaintiffs] after becoming aware of" these facts which made Ms. Clark unfit to work in Plaintiffs' home; and "knew of prior thefts at [Plaintiffs'] home, and that [Ms.] Clark was a primary suspect who consequently should have no longer been assigned to work at [Plaintiffs'] home," but "continued to assign [Ms.] Clark to provide in-home care to [Plaintiffs] despite . . . assurances it would no longer do so[.]"

Plaintiffs allege that Defendant's actions and inaction "recklessly created a dangerous situation for [Plaintiffs] . . . by continuing to assign to provide in-home care services an unsafe individual with a criminal history who lacked a valid driver's

license[,]" the Defendant "had the ability to assign [Ms.] Clark to a different position other than providing in-home care services to . . . [Plaintiffs], but it recklessly continued to assign [Ms.] Clark to work as an in-home aide[,]" and that Defendant "knew or should have known that its actions and inactions described herein were reasonably likely to result in injury, damage, or other harm to [Plaintiffs.]" Plaintiffs concluded: "The September 29, 2016 home invasion and robbery was a direct result of Health-Pro assigning [Ms.] Clark to provide in-home care services and thereby allowing her continuing access to [Plaintiffs] and their home[,]" and that Defendant's "conduct, undertaken with a reckless disregard for the safety of others . . ., was undertaken by Health-Pro's owners, officers, directors, or members of its management and, at the very least, was condoned by Health-Pro's owners and management."

## 2. **Evidence at Trial**

Defendant argued at trial that Plaintiffs' complaint alleged a cause of action for negligent hiring, not ordinary negligence, based in part on the testimonial evidence. For example, the following exchange occurred during the direct examination of Mr. Keith:

Q. When you [Mr. Keith] hired Health-Pro did you ever speak to anybody from the company?

A. Oh, yes, Mr. Bailey *and all the girls that worked for us*.

Q. Do you remember anyone saying anything about *background checks*?

A. *No*, not offhand, no.

. . . .

Q. [D]id you *have an understanding about background checks, about whether or not they would be run*?

. . . .

A. *I thought [background checks] had been [conducted]*, yes.

. . . .

Q. Did anyone from Health-Pro ever *tell you* if *she didn't have a driver's license*?

A. *No*.

. . . .

Q. Did anyone *tell you* anything about her *Facebook posts*?

A. *No*.

Q. When she was *assigned* to your home *did you assume that she had been fully screened* by Health-Pro?

A. *Yes*, I did.

. . . .

Q. Did you trust Health-Pro to *assign her only if she was going to be . . . safe* to have in the home?

A. I never really discussed that with them.

. . . .

Q. *Not pose a danger*?

A. *Yes.*

. . . .

Q. At some point, Mr. Keith, did y'all start having money missing from your home?

A. Yes.

. . . .

Q. Did anyone *tell Health-Pro* about this?

A. *I did*, yes.

Q. And *what happened*?

A. *I didn't see anything happen.* We were *told that they would look into it.* And after that nothing happened.

Q. Was [Ms.] Clark *pulled from the home for a period of time*?

A. *Yes, at one time she was.*

Q. Was that *when the money was missing*?

A. *Yes.*

Q. Was *that when Health-Pro said they would look into it*?

A. *Yes.*

. . . .

Q. *Do you know why she was put back in the home*?

A. I assume they needed her for the work.

. . . .

19

> Q. Did *you assume that before she had been put back in the house that Health-Pro had done an investigation*?
>
> A. I didn't know anything about an investigation. *I didn't know that there was any need for one.*
>
> Q. Well, *when they pulled her* from the home when the money was missing *did you understand that they were looking into what happened*?
>
> A. *Yes, they pulled two of the girls at the same time*, [Ms. Clark] and one other [Ms. Little].
>
> . . . .
>
> Q. That period in 2016 *when money was missing*, was [*Ms. Clark] working in your home* during that period?
>
> A. She was working there, yes. *I don't know if she was in the house when it went missing or not.*

(Emphasis added). Plaintiffs also introduced two letters from the Pitt County Child Support Agency requesting Ms. Clark's employment information because the agency was "required by law to investigate the possibilities of obtaining child support for child(ren) entitled to parental support. [The law] requires employers to provide certain . . . information so that child support may be collected or enforced." During cross-examination, Mr. Keith testified as follows:

> Q. . . . . You were the one that had most of the business dealings with [Defendant] during the time that Health-Pro came in. And *during the time that you used their services from 2012 through the first half of 2016 you didn't have any concerns with the aides* they were sending into your home, *correct*?
>
> A. *Yeah.*

Q. Okay. And, in fact, *you had no problems with any of the aides in your home until later in 2016*, correct?

A. We had *problems with one or two of them, but they were personality problems*.

. . . .

Q. *One of the aides* you had a problem with was *[Ms.] Little*?

A. *Yes.*

. . . .

A. [Ms. Little] had problems with my family not me.

. . . .

Q. I want to turn your attention to the money that went missing from your home around August 2016, sir.

. . . .

Q. *Is it fair to say that you don't know which aide, if any, took money from the home*?

A. *No, I didn't.*

. . . .

Q. At any given time there were usually three or four aides circulating through the home throughout the day?

A. Three or four aides during the day, there was only one at a time.

. . . .

Q. And you testified in your deposition *you were satisfied with how Mr. Bailey handled your complaints* about the missing money, correct?

A. *Yes.*

Q. And, sir, talking about Ms. Clark herself.  *Prior to September 29th you had never had any concerns or problems with Ms. Clark in your home*, correct?

A. *No.*

. . . .

Q. [Ms. Clark] was *never verbally abusive to you or M[r]s. Keith*, correct?

A. *No.*

Q. She was *never physically abusive to you or M[r]s. Keith*?

A. *No.*

. . . .

Q. Do you recall testifying that in your deposition that your *daughter had an issue with Ms. Little*?

A. *Yes.*

Q. Okay.  And *Ms. Little was removed from the home at the same time Ms. Clark* was, correct?

A. I assume so, *within days.*

Q. And *Ms. Little did not return to your home*, correct?

A. *No.*

. . . .

Q. You testified in your deposition that *you could have refused* to have Ms. Clark come back into the home, correct?

A. *Yes.*

Q. Okay. And you testified in your deposition that *you never felt forced to have Ms. Clark back into your home* at any point, correct?

A. *That's correct.*

(Emphasis added). Mrs. Keith's testimony was generally in line with Mr. Keith's testimony above, including the questions about whether Defendant had informed her about any background checks on Ms. Clark, told her Ms. Clark did not have a valid driver's license, informed her of any concerning Facebook posts, and asked her about the facts surrounding the missing money. She also testified:

Q. Did [Ms. Clark] ever drive you places?

A. I can't remember. At that time we were changing so many employees that I lost track who drove me where.

Q. Do you think if she was there during the day and you needed to go somewhere she might have been one of the ones to drive you somewhere?

A. It's possible, but I never had a problem with any of the drivers.

. . . .

Q. Do you remember money going missing?

. . . .

A. I think it's my fault because I let someone see me take some money out of my dresser drawer and I didn't think much of it, but I was dumb enough to keep it where it was, same location and told Mr. Bailey about it and he asked permission to check my dresser drawer out, drawers. . . . . And after that there was nothing said about it, but [Ms. Clark] was absent for two days.[3]  Then all of a sudden she was back and I was quite surprised.

. . . .

A. I didn't ask for her.  They couldn't find someone and apparently she was there again.  . . . *I didn't think she had any problems because she's back working for me again.*

. . . .

[A.] I had *thought that she had been checked out because – I just thought she had been* that's why she – wound up coming back.

(Emphasis added).  Mrs. Keith testified on cross-examination:

Q. *[Y]ou don't know if that person* [that Mrs. Keith believed she saw when she was removing some money from her dresser drawer]  *was [Ms.] Clark*, right?

A. *It's possible*, but I – all I saw was an arm and *at that time* [when she believed she saw one of the aides nearby as she was removing money], as I said previously, we were having *a changeover of personnel.  Frankly, I don't remember who was on what nights.*

. . . .

Q. [W]hat it says [in your deposition is], *Did you suspect any particular aide of taking that money*, correct?

---

[3] The evidence shows that Ms. Clark was working at a different household for Defendant for at least two to three weeks before being returned to Plaintiffs' home.

A. *Yes.*

Q. Okay. And then *your response up at the top was no*, correct?

A. *Yes.*

. . . .

Q. I want to talk about [Ms.] Clark, herself, with you. *You have characterized her in your deposition testimony as nice and pleasant*, correct?

A. *Yeah.*

Q. And prior to the night of September 29th *you never had any concerns about Ms. Clark being an aide in your home*, correct?

. . . .

A. *No*, I – because *they always mentioned we check our people out.*

Q. And you also testified previously that *when she returned* to your home in early September of 2016, that *you kept a closer eye on her but there wasn't anything going on*, correct?

A. No, but there had to be something going on.

Q. But *you didn't have any uneasy feeling or suspicion about Ms. Clark being in your home during that time frame*, correct?

A. *No, . . .* she never talked much. Very quiet.

Q. And do you recall . . . testifying in your deposition that *. . . there was nothing that Ms. Clark did that alerted you to her being involved in September 29th's events prior to those events*, correct?

> A. I wouldn't know, *I never saw her do anything or take anything*, so –

(Emphasis added).

Plaintiffs' children, Frederick, Sarah Keith ("Sarah"), and Margret Keith ("Margret"), were also questioned thoroughly by Plaintiffs' attorney concerning whether they were informed by Defendant about Ms. Clark's criminal record, invalid driver's license, and Facebook posts.

During the charge conference, Defendant's attorney argued that the trial court should give an instruction on negligent hiring, supervision, or retention. Plaintiffs' attorney argued against giving that instruction, contending that Plaintiffs' action was one of ordinary negligence. The trial court ruled in favor of Plaintiffs and only charged the jury on ordinary negligence.

### 3. **"Ordinary" Negligence**

Plaintiffs contend that they properly pled ordinary negligence, and only ordinary negligence; in part because their complaint only included a claim titled "negligence," nowhere mentioned "negligent hiring"; and that "ordinary" negligence was the only claim they pursued at trial. They therefore argue that the trial court was correct to deny Defendant's motions for directed verdicts and a JNOV, that the trial court did not err in refusing Defendant's request to instruct on negligent hiring, and that the jury was properly instructed on "ordinary" negligence as the sole theory of Defendant's liability.

26

Defendant argues that Plaintiffs' allegations and the facts of this case constituted a claim for negligent hiring and, therefore, Plaintiffs were obligated under law to prosecute their claim as one for negligent hiring. We agree with Defendant.

In arguing that the general requirements of an action in ordinary negligence were appropriately applied in this case, Plaintiffs argue that "a contractual relationship can give rise to the duty of ordinary care." However:

> The law imposes upon every person who enters upon an active course of conduct the positive duty to use ordinary care to protect others from harm and a violation of that duty is negligence. *It is immaterial whether the person acts in his own behalf or under contract* with another. An act is negligent if the actor intentionally creates a situation which he knows, or should realize, is likely to cause a third person to act in such a manner as to create an unreasonable risk of harm to another. Restatement, Torts [§] 302, 303.

*Toone v. Adams*, 262 N.C. 403, 409, 137 S.E.2d 132, 136 (1964) (emphasis added) (citation omitted). Our Supreme Court in *Toone* further discussed the limited relevance of contractual obligations when the plaintiff decides to bring the action in tort instead of contract:

> It is well settled in North Carolina that where a contract between two parties is intended for the benefit of a third party, the latter may maintain an action in contract for its breach or in tort if he has been injured as a result of its negligent performance. The parties to a contract impose upon themselves the obligation to perform it; the law imposes upon each of them the obligation to perform it with ordinary care and they may not substitute a contractual standard for this obligation. *A failure to perform a contractual obligation is never a tort unless such*

27

> *nonperformance is also the omission of a legal duty*. The contract merely furnishes the occasion, or creates the relationship which furnishes the occasion, for the tort.

*Id.* at 407, 137 S.E.2d at 135 (emphasis added). Plaintiffs do not cite any authority that tends to show Defendant's duty to Plaintiffs was somehow more comprehensive due to the contract between them. We agree with Plaintiffs that, due to their contract with Defendant, Defendant had the duty of reasonable care in selecting applicants, including Ms. Clark, that were fit persons to work as in-home aides. However, that duty would exist even if there was no express contract between Plaintiffs and Defendant. *Id.* at 409, 137 S.E.2d at 136. Defendant's general duty to Plaintiffs in relation to the acts of Ms. Clark is no different because of the contractual relationship between Plaintiffs and Defendant—Defendant had a duty to exercise due care in hiring Ms. Clark, and that duty of due care continued throughout Ms. Clark's employment. *Id.* We note that the Rhode Island case cited by Plaintiffs, *Welsh Mfg. v. Pinkerton's, Inc.*, 474 A.2d 436 (R.I. 1984), was a negligent hiring or supervision case. *Id.*, at 442-44; *see also id.* at 441 (citation omitted) ("An employer's duty does not terminate once an applicant is selected for hire. Other courts have stated that an employer has a duty to retain in its service only those employees who are fit and competent."). That is not to say the terms of the contract cannot be considered as part of the factors establishing the *context* from which the trial court or jury determines the "reasonably prudent person" baseline.

Plaintiffs contend: "The duty of ordinary care applies to a broad range of conduct. Indeed, this Court has found an ordinary negligence instruction proper in a host of circumstances, including those implicating other areas of the law." However, Plaintiffs cite no case stating an employer can be held liable for the criminal actions of its employee in an ordinary negligence action. Plaintiffs provide the following legal precedent for their argument: "For example, in *Klinger v. SCI North Carolina Funeral Services., Inc.*, [189 N.C. App. 404, 659 S.E.2d 99 (2008)] (unpublished), this Court affirmed a trial court's use of an ordinary negligence instruction in a case about mishandling of a corpse. *Id[.]*" *Klinger* is an unpublished case, has no precedential value, involves statutory law regulating the disposition of human remains that is no longer in effect, and the issue of "duty" was decided pursuant to the relevant statutes. *Id.*

Plaintiffs' additional cite in support of its position, *Peal ex rel. Peal v. Smith*, 115 N.C. App. 225, 444 S.E.2d 673 (1994), <u>aff'd by equally divided court</u>, 340 N.C. 352, 457 S.E.2d 599 (1995) (underlining added), is also an opinion without precedential value. *Peal By Peal v. Smith*, 340 N.C. 352, 457 S.E.2d 599 (1995) (when the votes in an opinion by our Supreme Court are equally divided, "the decision of the Court of Appeals is left undisturbed and stands without precedential value"). Plaintiffs contend: "Similarly, in *Peal*, this Court used an ordinary negligence analysis in what the parties had concluded was a dram shop case. This case is no different." (citations omitted). We disagree. In *Peal*: "The plaintiff . . . instituted a

claim based in [ordinary] negligence against Defendant Smith and against his employer, Cianbro." *Peal*, 115 N.C. App. at 229, 444 S.E.2d at 676–77. This Court in *Peal* relied in part on Restatement (Second) of Torts § 317, which states:

> [An employer] is under a duty to exercise reasonable care so to control his [employee] while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> > (a) the [employee]
> >
> > > (i) is upon the premises in possession of the [employer] or upon which the [employee] is privileged to enter only as his [employee], or
> > >
> > > (ii) is using a chattel of the [employer], and
> >
> > (b) the [employer]
> >
> > > (i) knows or has reason to know that he has the ability to control his [employee], and
> > >
> > > (ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 317 (1965). Concerning section 317(a)(ii), our Supreme Court has noted in a negligent hiring case: "A review of our pertinent case law reveals no support for the application of this particular section of the Restatement. We find no case in which liability has been imputed to an employer solely on the basis of an employee 'using a chattel of the [employer].' We decline to recognize this theory of liability in the situation presented in this case." *Braswell v. Braswell*, 330 N.C. 363, 375, 410 S.E.2d 897, 904 (1991). Our review uncovers five

North Carolina opinions citing Restatement (Second) of Torts § 317, including *Peal* and *Braswell*. In none of these opinions has "liability [ ] been imputed to an employer solely on the basis of" section 317. *Id.* In *Peal*, this Court held: "the common law duty of [an employer] to control his [employee] under certain circumstances as outlined in Restatement § 317, taken together with the [employer's] own written policies established a standard of conduct that if breached could result in actionable negligence." *Peal*, 115 N.C. App. at 233, 444 S.E.2d at 679. In light of the equally divided decision of our Supreme Court in *Peal*, rendering it without precedential value, we decline to adopt the analysis in *Peal*. We need not decide whether Restatement § 317 states a separate common law theory of negligence recognized in North Carolina, as Ms. Clark, on 29 September 2016, was neither on Defendant's premises or in a place she was "privileged to enter" at that time, nor did Defendant have any ability or opportunity to control Ms. Clark on 29 September 2016, or know of any necessity to do so and, therefore, the facts in this case do not meet the requirements as set forth in section 317. Restatement (Second) of Torts § 317.

We hold that, on the facts before us, the only action pled in Plaintiffs' complaint was one for negligent hiring. As made clear by the allegations in the complaint itself, as well as the testimony and other evidence presented at trial, Plaintiffs' allegations break down as follows: (1) Defendant's investigation into Ms. Clark's background was insufficient; (2) facts from Ms. Clark's background and application for employment that Defendant either knew, or should have known, made Ms. Clark unfit to be an

in-home aide in Plaintiffs' home; (3) once Defendant learned about the two incidents when money was taken from Plaintiffs' home, and identified Ms. Clark as one of two aides who were working in Plaintiffs' home during the relevant time periods, which initially led to both aides being removed from Plaintiff's home, Defendant should not have returned Ms. Clark to service in Plaintiffs' home; (4) additionally, Defendant's investigation of Ms. Clark following the money incidents was insufficient; and (5) Defendant should have considered the two child support notices as a motive indicating Ms. Clark's responsibility for the thefts from Plaintiffs' home.

*All* of Plaintiffs' relevant allegations and evidence directly challenge whether Defendant should have hired Ms. Clark as an in-home aide; whether Defendant acted appropriately in response to hearing from Plaintiffs that money had been taken from their home on two occasions—which would have involved either greater supervision of—such as moving Ms. Clark to a no-client-contact position, as suggested by Plaintiffs—or a decision regarding whether to retain her in Defendant's employ at all. Plaintiffs have cited no binding authority for the proposition that an action brought on allegations, and tried on facts, that clearly fall within the scope of a negligent hiring claim may avoid the heightened burden of proving all the elements of negligent hiring by simply designating the action as one in ordinary negligence, and we find none. Were we to accept Plaintiffs' arguments, it is unclear what relevance the firmly-established doctrine of negligent hiring would retain in North Carolina—it is difficult to foresee a circumstance where a plaintiff would choose to

bring a negligent hiring action instead of an action in ordinary negligence. The evolution of employer liability jurisprudence, which includes the common law development of the negligent hiring doctrine for the purpose of *expanding* the limits of employer liability to third parties injured by the acts or omissions of employees, strongly suggests the doctrine of negligent hiring was intended as the *sole* means of imposing liability on employers who, as in this case, are alleged to have created circumstances by which their own negligent acts or omissions—their failure to exercise due care in protecting third parties from dangerous employees—were the proximate cause of injury to a third party. Noting that resolution of all negligence claims, including negligent hiring claims, is always a highly fact specific undertaking, we hold, on the facts of this case, that the sole claim alleged in Plaintiffs' complaint was one for negligent hiring, retention, or supervision. In this case, it was error for this action to proceed as a claim in ordinary negligence, and the trial court erred in denying Defendant's request for the jury to be instructed accordingly. This error was clearly prejudicial and would normally require a new trial. However, Defendant's motions for a directed verdict and a JNOV were argued pursuant to negligent hiring, as Defendant correctly contended that the facts as alleged and presented at trial only supported a negligent hiring claim.

In addition, in light of Plaintiffs' intention to proceed under an ordinary negligence theory, Defendant also moved for a directed verdict based on insufficiency of the evidence to support that alleged claim, beginning its argument as follows:

> In order to succeed on [negligent hiring]—and even in an ordinary negligence case [ ] Plaintiffs have to show that the events of September 29th, 2016, and [Ms.] Clark's unfitness and participation in those events were foreseeable to my clients. Those are the events that have caused [ ] Plaintiffs the only injury they complain of. And there is nothing in the record that suggests that it was foreseeable.

Defendant's motion for a directed verdict at the close of all the evidence, as well as its motion for a JNOV after the verdict, were renewals of these arguments.

We hold that the trial court erred in denying Defendant's motions with respect to ordinary negligence, as that claim was not properly before the trial court, and no evidence could support it. We therefore reverse and remand with instruction to the trial court to enter an order granting Defendant a JNOV on Plaintiffs' claim in ordinary negligence. Plaintiffs argued to the trial court that their claim was solely based in ordinary negligence, and that it did not include any claim pursuant to negligent hiring. They maintain that argument on appeal. Therefore, our holding would normally end the matter.

However, because there is a possibility that Plaintiffs will try and file an action against Defendant for negligent hiring, we believe it is appropriate to consider Defendant's motion for a JNOV based upon negligent hiring. As Plaintiffs implicitly acknowledge by several statements such as "the jury could have—and would have—reached the same conclusion, regardless of the instruction it was given[,]" the facts Plaintiffs presented to the jury would not have been different had they proceeded under a negligent hiring theory. We therefore consider Defendant's argument that

Plaintiffs' evidence was insufficient to survive Defendant's motion for a JNOV based upon the theory of negligent hiring. We note that neither party has suggested Plaintiffs' evidence could support an action based upon *respondeat superior*, and we hold that, even if such a claim had been made, Plaintiffs' evidence could not support it.

### 4. **Negligent Hiring, Retention, and Supervision**

We therefore continue our analysis by conducting a review based upon a claim for negligent hiring, which Defendant contends is the only basis upon which Plaintiffs' negligence claim should have been submitted to the jury. After review of Plaintiffs' complaint and the facts developed at trial, we have determined that a claim for negligent hiring was properly pled, and evidence tending to support at least certain elements of such a claim was introduced at trial. Therefore, we review the evidence to determine whether the evidence was sufficient to survive Defendant's motion for a JNOV.

### a. Standard of Review

In an action based upon negligent hiring, "there must be a duty owed by the employer to the plaintiff in order to support an action for negligent hiring." *Little v. Omega Meats I, Inc.,* 171 N.C. App. 583, 587, 615 S.E.2d 45, 48 (2005), *aff'd per curiam*, 360 N.C. 164, 622 S.E.2d 494 (2005). "It is only after a plaintiff has established that the defendant owed a duty of care that the trial court considers the

other elements necessary to establish a claim for negligent hiring or retention[.]" *Id.*

at 588, 615 S.E.2d at 49 (citation omitted).

> Once that duty is established then the plaintiff must prove four additional elements to prevail in a negligent hiring and retention case: "(1) the independent contractor acted negligently; (2) he was incompetent at the time of the hiring, as manifested either by inherent unfitness or previous specific acts of negligence; (3) the employer had notice, either actual or constructive, of this incompetence; and (4) the plaintiff's injury was the proximate result of this incompetence."

*Id.* at 587, 615 S.E.2d at 48 (2005).

Along with the general requirements a plaintiff must prove in order to establish an employer's duty of care, this Court has identified three specific elements that must be proven in order to show that an employer had a duty to protect a third party from its employee's negligent or intentional acts committed outside of the scope of the employment:

> One commentator, in analyzing the requisite connection between plaintiffs and employment situations in negligent hiring cases, noted three common factors underlying most case law upholding a duty to third parties: (1) the employee and the plaintiff must have been in places where each had a right to be when the wrongful act occurred; (2) the plaintiff must have met the employee[, "when the wrongful act occurred,"] as a direct result of the employment; and (3) the employer must have received some benefit, even if only potential or indirect, from the meeting of the employee and the plaintiff [that resulted in the plaintiff's injury].

*Id.* at 587-88, 615 S.E.2d at 49. This Court "decline[s] to hold employers liable for the

acts of their . . . employees under the doctrine of negligent hiring or retention when

*any one* of these three factors was not proven." *Id.* at 588, 615 S.E.2d at 49 (citations omitted).

b. Defendant's Duty of Care Under *Little*

Plaintiff argues that the requirements as set forth in *Little* do not control in this case. We disagree. In *Little*, this Court held:

> In the instant case [the employee] was not in a place where he had a legal right to be since he broke in to plaintiffs' home; [the employee] and plaintiffs did not meet as a direct result of [the employee's] relationship with defendants, since [the employee] did not enter plaintiffs' home as a salesman; finally, defendant[-employers] received no benefit, direct, indirect or potential, from the tragic "meeting" between [the employee] and plaintiffs. We have found no authority in North Carolina suggesting that defendant[-employers] owed plaintiffs a duty of care on these facts, and we hold that in fact none existed.

*Id.*[4]

We find the facts in this case analogous; Ms. Clark had no legal right to be at Plaintiffs' home, as a co-conspirator in the breaking and entering of Plaintiffs' home, that resulted in the robbery and kidnapping; Ms. Clark's presence at Plaintiffs' home on 29 September 2016 was not "as a direct result of [her] relationship with [Defendant], since [Ms. Clark] did not [constructively] enter plaintiffs' home as a[n in-home aide]"; and "[D]efendant[ ] received no benefit, direct, indirect or potential, from the tragic 'meeting' between [Ms. Clark] and [P]laintiffs." *Id.* Although, unlike

---

[4] *Little* involved an independent contractor of the employer, not an employee, but this distinction does not affect our analysis.

37

the employee in *Little* who did not know his victim, Ms. Clark had worked for Plaintiffs for nearly a year, we hold, *on the facts of this case*, that these elements are necessary to establish Defendant's duty to protect Plaintiffs, and there is no evidence that supports any of these three elements. We examine the facts of this case in detail below. For these reasons, we hold that Plaintiffs' evidence was insufficient to survive Defendant's motion for a JNOV, and reverse and remand for entry of a JNOV in favor of Defendant on any negligent hiring, supervision, or retention claim based on the events of 29 September 2016. We recognize that the jury was not instructed on negligent hiring, but Defendant's motion for a JNOV was a renewal of his motions for directed verdicts, the denial of which also constituted prejudicial error to Defendant demanding this result.

We note that the *Little* requirements are associated with proving an employer's *duty of care*, not proximate cause. These elements go to the foreseeability that an employee will commit a wrongful act against a specific plaintiff, as well as differentiating between acts committed under color of the employee's employment with the employer—for which the employer may have had a duty to act to prevent, and acts committed by the employee acting wholly independent of her status as the employer's employee—for which the employer normally would not have had a duty to act to prevent. Nonetheless: "It is not possible to state definite rules as to when the actor is required to take precautions against intentional or criminal misconduct." Restatement (Second) of Torts § 302B(f.) (1965). Therefore, we do not dismiss the

possibility that under an extraordinary set of facts an employer may have a duty to protect a third party from a negligently hired employee even though one or more of the factors set forth in *Little* are not met. "What is meant by legal duty . . . varies according to *subject matter and relationships*." *O'Connor v. Corbett Lumber Corp.*, 84 N.C. App. 178, 181, 352 S.E.2d 267, 270 (1987) (emphasis added) (citation omitted).

c. Defendant's Liability Notwithstanding the *Little* Requirements

Assuming, *arguendo*, the requirements set forth in *Little*, 171 N.C. App. at 587-88, 615 S.E.2d at 49, are not applicable in this case, we still find that the trial court erred in denying Defendant's motion for a JNOV based on a theory of negligent hiring.

"[T]he concept of negligence is composed of two elements: legal duty and a failure to exercise due care in the performance of that legal duty[.]" *O'Connor*, 84 N.C. App. at 181, 352 S.E.2d at 270 (citation omitted). Therefore, absent the *Little* requirements, Plaintiffs still had the burden of proving Defendant owed them a duty to protect them from Ms. Clark's criminal acts of 29 September 2016. "Negligence "'presupposes the existence of a legal relationship between the parties by which the injured party is owed a duty which either arises out of a contract or by operation of law.'" 'If there is no duty, there can be no liability.'" *Prince v. Wright*, 141 N.C. App. 262, 266, 541 S.E.2d 191, 195 (2000). Further,

> the *presumption is that the [employer] has properly performed his duty in selecting his [employees]*, and before responsibility for negligence of [an employee] proximately causing injury to plaintiff . . . can be fixed on the [employer], it must be established by the greater weight of

39

the evidence, the *burden being on the plaintiff*, that [the plaintiff] has been injured by reason of carelessness or negligence . . . *and that the [employer] has been negligent in employing or retaining such incompetent [employee], after knowledge of the fact [of the employee's unfitness]*, either actual or constructive.

*Pleasants v. Barnes*, 221 N.C. at 177, 19 S.E.2d at 629 (emphasis added) (citations omitted).  As stated in the Second Restatement:

> It is not possible to state definite rules as to when the actor is required to take precautions against intentional or criminal misconduct.  As in other cases of negligence (see §§ 291- 293), it is a matter of balancing the magnitude of the risk against the utility of the actor's conduct.  Factors to be considered are the known character, past conduct, and tendencies of the person whose intentional conduct causes the harm, the temptation or opportunity which the situation may afford him for such misconduct, the gravity of the harm which may result, and the possibility that some other person will assume the responsibility for preventing the conduct or the harm, together with the burden of the precautions which the actor would be required to take.  Where the risk is relatively slight in comparison with the utility of the actor's conduct, he may be under no obligation to protect the other against it.

Restatement (Second) of Torts § 302B(f.) (1965).  Further,

> Normally the actor has much less reason to anticipate *intentional* misconduct than he has to anticipate negligence.  In the ordinary case he may reasonably proceed upon the assumption that others will not interfere in a manner intended to cause harm to anyone.  This is true *particularly where the intentional conduct is a crime*, since under ordinary circumstances it may reasonably be assumed that no one will violate the criminal law.  Even where there is a recognizable possibility of the intentional interference, the possibility may be so slight, or there may be so slight a risk of *foreseeable* harm to another as a result

of the interference, that a reasonable man in the position
of the actor would disregard it.

Restatement (Second) of Torts § 302B(d.) (1965). This Court has recognized the rule that normally an employer will not be expected to anticipate criminal acts of its employee:

> As a general rule "[n]o person owes a duty to anyone to anticipate that a crime will be committed by another, and to act upon that belief." 57 Am. Jur. 2d Negligence Section 63 (1971). However, a duty to afford protection of another from a criminal assault or willful act of violence of a third person may arise, at least under some circumstances, if that duty is voluntarily assumed. *Id.*

*O'Connor*, 84 N.C. App. at 182, 352 S.E.2d at 270. This Court has recognized that when "'the particular assault was not committed within the scope of the employment'":

> [E]mployers of certain establishments can [only] be held liable to an invitee therein assaulted by an employee of the place of business whom the employer "knew, or in the exercise of reasonable care in the selection and supervision of his employees should have known, to be likely, by reason of past conduct, bad temper or otherwise, to commit an assault, even though the particular assault was not committed within the scope of the employment."

*Stanley v. Brooks*, 112 N.C. App. 609, 611, 436 S.E.2d 272, 273 (1993) (citation omitted). Actions for negligent hiring require two distinct "foreseeability" requirements. First, was the injury allegedly sustained by the third party due to the acts of the employee of a kind reasonably foreseeable by the employer, thereby creating a duty to protect the third party. Second, if the employer's duty to protect is

proven, there is a foreseeability requirement for proving the employer's negligence was the proximate cause of the third party's injury and damages. *Stein v. Asheville City Bd. Of Educ.*, 360 N.C. 321, 328 n.5, 626 S.E.2d 263, 268 n.5 (2006) (citation omitted) (just as with the element of duty, "[f]oreseeability is also an element of proximate cause[,]" but when the reviewing court "hold[s] no duty existed, [it is] not [required to] reach the question of proximate cause"). These foreseeability analyses may overlap considerably since both require application of the same set of facts to the law. Employers in certain kinds of businesses—and we find Defendant's business to fall into this category—have an enhanced general duty to insure their employees are fit to undertake the employment for which they are hired—these are generally businesses that involve dangerous equipment or activities, and businesses where the employee will come in frequent contact with the general public or particular individuals. More care is required when hiring someone for jobs involving the use of explosives, flying aircraft, or providing medical care, for example, than for working at a typical desk job. However, even when there is a general duty of care, the plaintiff must still demonstrate that the employer had a specific duty to protect the plaintiff from injury of a kind similar to the actual injury resulting from the employee's acts.

The initial question in a negligent hiring action is did the employer use reasonable care before hiring an employee, taking into account the particular skills or character traits required to safely perform in the position. If the employer used reasonable care before hiring an employee in light of the particularities of the job,

and the employer continued to use reasonable care in supervising and retaining the employee, then the employer cannot be held liable for acts of the employee, not occurring in the course the employment, that cause injury to a third party. Importantly, even when the employer fails to act with due care in the hiring, supervision, or retention of an employee, the employer is *only* liable to third parties for the employee's acts outside of employment if the employee's acts *are of a kind* that were reasonably foreseeable *based solely on the characteristics of the employee that made the employee unfit for the position*, and only those disqualifying characteristics of which the employer *actually knew*, or would have discovered *had the employer acted with due care. Stanley v. Brooks*, 112 N.C. App. 609, 611, 436 S.E.2d 272, 273 (1993) (the plaintiff must prove "that the injury complained of resulted from the incompetency" rendering the employee unfit, and the employer's actual or constructive knowledge of the employee's particular unfitness).

In this case, in order to prove that Defendant had a duty to protect Plaintiffs from Ms. Clark's criminal acts, Plaintiffs had to prove that, based upon all the information Defendant knew, or, exercising due care should have known, a reasonable person would have foreseen that Ms. Clark was likely to conspire with dangerous individuals to perpetrate a home invasion robbery against Plaintiffs, by breaking into the house, controlling Plaintiffs by the use of firearms, and forcing Mr. Keith to drive to an ATM to obtain more cash—*or* some other criminal act against Plaintiffs of a similar nature and severity. *Murphey v. Georgia Pac. Corp.*, 331 N.C.

702, 706, 417 S.E.2d 460, 463 (1992) (the plaintiff must prove that "a person of ordinary prudence could have reasonably foreseen that such a result or some similar injurious result was probable") (citation omitted).

We first review the evidence to decide whether it was sufficient, pursuant to the doctrine of negligent hiring, to demonstrate Defendant had a duty to protect Plaintiffs from Ms. Clark's criminal acts on 29 September 2016. Adapting the standard as set forth by our Supreme Court to align with the facts of this case:

> With regard to the first element, [Defendant] ha[d] a duty to exercise due care in [hiring and supervising Ms. Clark]. The standard of due care is always the conduct of a reasonably prudent person under the circumstances. Although the standard remains constant, the proper degree of care varies with the circumstances.

*Bolkhir v. N. Carolina State Univ.*, 321 N.C. 706, 709, 365 S.E.2d 898, 900 (1988) (citations omitted). Further, "the presumption is that the [employer] has properly performed his duty in selecting his [employees.]" *Pleasants*, 221 N.C. at 177, 19 S.E.2d at 629 (citation omitted). Plaintiffs were required to rebut this presumption with evidence from which the jury could have reasonably found in favor of Plaintiffs on every element of negligent hiring. *Id.* The first issue is whether Defendant used due or reasonable care in hiring Ms. Clark, and in supervising her during her employment, with the presumption being that it did.

Defendant began providing in-home aide services in 2010, and began providing these services to Plaintiffs on 13 February 2012. The uncontested evidence shows

44

that none of Defendant's clients had reported any thefts or violent crimes—nor any other crimes, and that none of Defendant's clients had complained about any serious issues involving Defendant's in-home aides.[5]  Ms. Clark began working for Defendant in September of 2015, and began working in Plaintiffs' home in late 2015, after having worked with another of Defendant's clients.  There is no evidence that Ms. Clark's work or character was found wanting by the client in Ms. Clark's first in-home care aide position working for Defendant.  Plaintiffs' testimonies in the depositions and at trial demonstrated, repeatedly, that they only had positive things to say about Ms. Clark's work, care, personality, and character prior to 29 September 2016.  Mr. Keith testified that, "[p]rior to September 29th [he] had never had any concerns or problems with Ms. Clark[.]"  Ms. Clark testified that "prior to the night of September 29th [2016 she] never had any concerns about Ms. Clark being an aide in [her] home," and "didn't have any uneasy feeling or suspicion about Ms. Clark being in [her] home during that time frame[.]"  None of the members of the Keith family who testified expressed any concerns, suspicions, or red flags related to Ms. Clark's regular in-home work providing care for Plaintiffs.  None of them testified to any suspicions that Ms. Clark was the person responsible for the missing coins, the missing money from Mrs. Keith's dresser, or missing cash from Mr. Keith's wallet—until after 29 September

---

[5] Mr. Bailey testified that one prior client had reported money in her house had been taken, and Defendant removed the aide who the client suspected from the home.  According to Mr. Bailey, the client later called back to inform Defendant that she had found the money she thought had been stolen, and requesting the return of the removed aide.  The aide refused.

2016. By all accounts, Ms. Clark was an able, quiet, polite, and professional employee and, other than Margret's testimony that she complained that the aides working in Plaintiffs' home were not performing some of the duties that Defendant's informational materials indicated were to be provided, there were no complaints lodged against Ms. Clark, nor any disciplinary action taken, while she worked for Defendant—until the events of 29 September 2016.

Plaintiffs never contacted Defendant with any negative reports concerning Ms. Clark, nor expressed any fears or suspicions that Ms. Clark might be stealing from them, or otherwise represented any kind of threat to them or anyone else. Both Mr. Keith and Mr. Bailey considered the other to be a "friend," and Mr. Bailey went to Plaintiffs' home at least every two weeks. Mr. Bailey was collecting payment from Plaintiffs on these bi-weekly visits, but he also checked in with Plaintiffs about how they were doing, if the aides were working out, and generally socialized to the degree that Mr. Keith thought of Mr. Bailey as a friend. Mr. Bailey also called Plaintiffs fairly regularly, to discuss any topics relevant to Defendant's provision of care for Plaintiffs, and to generally "check in." Mr. Bailey's testimony was uncontested that Defendant's aides were supervised by "the R.N.s [registered nurses] and . . . the HR director," and that the R.N.s would supervise the aides in the client's homes on a regular schedule. Ms. Bailey testified: "The nurse is the supervisor for the aides. Also, the nurse goes out to the home of each client because they do a ninety-day supervised revisit. They also do an evaluation of how things are going in the home.

46

They talk with the aide that's there in the home." A "validation of skills" form completed by one of Defendant's supervising R.N.s, Wanda Patrick ("Ms. Patrick"), was entered into evidence. This form was one of the in-home evaluations of Ms. Clark conducted in July 2016. Ms. Patrick's evaluation of Ms. Clark did not include any "unsatisfactory" responses to Ms. Clark's performance as an in-home aide.

Frederick testified that Margret "had a unique role in the sense that when she would come to town she would have the opportunity to spend multiple days in the home." "She would actually stay at the home so she would see the whole process for twenty-four, forty-eight, seventy-two hours at a time, which my other sister and I would not have that opportunity because we didn't overnight at the home[.]" Margret testified: "Well, [Ms. Clark] came in at night some, but she was there on the weekends and she was there on some days, too." Although Margret had the most opportunity of Plaintiffs' children to observe Ms. Clark and the other aides at work, and to get to know them personally, in her testimony Margret expressed no concerns about Ms. Clark prior to 29 September 2016.

Evidence shows that Ms. Clark's three references were called, one could not be contacted, one assessed Ms. Clark as having an "excellent" work ethic, stating she "is a very hard worker she does [and] completes the task at hand[,]" and indicated that she was punctual. He also assessed her "professionalism and attitude" as "excellent," and stated: "I would hire [Ms. Clark] to work for me. Very good worker." A second reference assessed Ms. Clark's work ethic, punctuality, professionalism, and attitude

as "Good." After one of Defendant's nurse-employee's interviewed Ms. Clark for approximately two hours, Ms. Bailey interviewed Ms. Clark, and had only positive responses to Ms. Clark's performance and demeanor in the interview, referring to Ms. Clark as "very soft-spoken. She was very mild and easygoing." "She was pleasant[,]" and "[v]ery polite. She always answered with yes, ma'am and no, ma'am. Just easygoing." When asked if her interview with Ms. Clark raised any concerns about the fitness of Ms. Clark, Ms. Bailey stated: "No, I didn't have any concerns." Ms. Bailey testified Ms. Clark regularly came into Defendant's office, and was always "pleasant," and that Ms. Clark's nurse supervisor would accompany Ms. Clark to the home of the client(s) Defendant was servicing to evaluate Ms. Clark's performance and the clients' satisfaction every ninety days. Ms. Bailey stated that Ms. Clark never received an evaluation of "unsatisfactory" for any category on any of her evaluations. Ms. Bailey testified concerning Plaintiffs' regard for Ms. Clark's work: "I received calls of how awesome [Ms. Clark] was and how pleased [Plaintiffs] were with her work and how she was always prompt and pleasant and respectful so I—you know, I didn't have any concerns about her."

When Ms. Clark was hired in 2015, she had three misdemeanor convictions for non-violent crimes: 2008: Conviction for driving while license revoked; 2009: Conviction for possession of drug paraphernalia; and 2010: Conviction for criminal contempt. Plaintiffs also note that Ms. Clark was twice charged "for communicating threats"; however, these charges were dismissed because the complainant refused to

cooperate with prosecutors. Ms. Clark had no felony convictions and was therefore hirable pursuant to Defendant's written standards for employment. Mr. Bailey testified that Ms. Clark checked the box on her application indicating that she had never been convicted of a crime, which was not true, but she also filled out a criminal background check authorization form, which permitted Defendant to run a background check at any time during her employment. Defendant testified that it conducted a thorough criminal background check on Ms. Clark, and knew about all convictions and charges listed above, but could only produce two criminal search documents, one undated that simply indicated that Ms. Clark had some criminal charge against her in 2007, and that it was "DISPOSED[,]" and a second that was requested after the events of 29 September 2016. Ms. Bailey testified that criminal background checks were run for every employee, and it was her understanding that one had been run on Ms. Clark.

Defendant's "CRIMINAL BACKGROUND INVESTIGATION POLICY" states: "The applicant shall be allowed to work if no reported felony convictions exist, pending receipt of the Criminal History Record information." Defendant's policy allowed employment of certain applicants who had been convicted of felonies, depending on the crimes committed and a favorable interview with the applicant concerning the felony convictions. Because Ms. Clark had never been convicted of a felony, Defendant did not break any contractual obligation to Plaintiffs by hiring an employee with misdemeanor convictions.

Defendant's criminal background check authorization form included a space asking for Ms. Clark's "Drivers License Number," and she filled in the space with the number for her N.C. Identification Card, which is the same as the number for her expired driver's license. Ms. Clark gave Defendant her N.C. Identification Card—along with her Social Security Card—to photocopy for its records. Defendant stated in its answers to Plaintiffs' interrogatories: "Driving clients was not a part of [Ms.] Clark's job duties[,]" and Plaintiff produced no evidence that Ms. Clark's duties included driving Plaintiffs nor, if Ms. Clark in fact drove Mrs. Keith on errands, that Defendant was aware of this fact. Defendant testified through Mr. Bailey that it had no knowledge of Ms. Clark driving Plaintiffs. Mrs. Keith testified that she could not recall if Ms. Clark ever drove her anywhere.

Plaintiff also produced two letters from the Pitt County Child Support Agency requesting Ms. Clark's employment information because the agency was "required by law to investigate the possibilities of obtaining child support for child(ren) entitled to parental support. [The law] requires employers to provide certain . . . information so that child support may be collected or enforced." These letters were dated 25 May 2016 and 9 September 2016. Plaintiffs contend this was evidence that Ms. Clark was in dire financial straits. Mr. Bailey testified that many of Defendant's workers have child-support obligations, and it was not unusual to get letters like these, concerning their aides, from county child support agencies.

Plaintiffs argue on appeal that Defendant should have conducted a Facebook investigation of Ms. Clark, and contend that several of Ms. Clark's Facebook posts were evidence of her violent or criminal disposition. Initially, these posts were not originated by Ms. Clark, they were "memes" created by someone else that she "reposted" on her Facebook page. More importantly, the trial court instructed the jury "that the Facebook posts may not be used by you in the determination of any fact in this case." We presume that the jury followed the trial court's instructions, and that the trial court did not consider these posts as substantive evidence when it denied Defendant's motion for a JNOV.

As Plaintiffs state in their brief: "[Defendant] assigned [Ms.] Clark to [Plaintiffs'] home shortly after it hired her in [late] 2015." Plaintiffs then contend, however: "Soon thereafter, things around the house started to go missing." Plaintiffs' evidence only allows speculation concerning whether Plaintiff was working for them when they noticed some of Mr. Keith's rolls of coins were missing, as Plaintiffs contend the coins were *noticed* to be missing in "the fall of 2015," there is no evidence suggesting the *actual theft* was conducted during that time period, and Ms. Clark only began working at Plaintiff's house at the end of the "fall 2015" time period. Further, even if Ms. Clark was working at Plaintiffs' home when the coins disappeared, the next "thing around the house" did not "go missing" until over a year later. Meaning Ms. Clark worked at Plaintiff's house for over a year with no evidence that anything was taken from Plaintiffs during that time period.

51

Plaintiffs' daughter Sarah testified that she was the person who noticed the missing coins: "I found some money missing myself." Sarah's memory of when she noticed coins missing was uncertain, stating that it was: "Last year, maybe the year before. It was recent – in my head it was recent." "Last year" would have been 2017, which was after the events of 29 September 2016 and the termination of Ms. Clark's employment. "The year before" would have been 2016.[6] However, Plaintiffs allege: "In the fall of 2015, [Plaintiffs] discovered that approximately $90.00 in rolled coins had been stolen from a box inside their home." Sarah testified that she immediately alerted Plaintiffs: "I immediately . . . took the box to my father and said, Daddy, someone has taken money from here. Someone has taken some rolls of quarters." Sarah stated that Mr. Keith "said, let's put it underneath the cabinet . . . so I'll know where it's at. And that was the last I saw of it." Mr. Keith testified: "My granddaughter found it missing to begin with and as I recall it was somewhere around – I think it was around $900.00 in the first group of coins that were taken in the rolls – coin wrappers."

Mr. Bailey testified that he had not been contacted about any money missing from Plaintiffs' house until August of 2016, when he was informed by Mr. Keith that

---

[6] If Sarah meant her statement to mean "a year ago, maybe two years ago," then she would be placing the event approximately between late March of 2016 and late March of 2017, as her testimony occurred on 20 March 2018. While Ms. Clark was working for Plaintiffs in March of 2018—and until the events of 29 September 2016, less the several weeks she was removed in August 2016—these time periods and her recollection that the theft was "recent" differ significantly from the alleged time period of "the fall of 2015."

$90.00 had been removed from his wallet.  Mr. Bailey also testified that Mrs. Keith

came to him at that point and informed him of the $1,200.00 missing from her dresser

drawer:

> [Mrs. Keith said] I'm missing some money as well.  And I says, well, how much are you missing and when did you realize that you was missing money?  And she says, well, I'm missing a little over $1,200.00 and me and Mr. Keith was both flabbergasted about that and says, you are missing how much?  . . . .  She told me it was in her drawer.  And I says, in your bedroom?  . . . .  I asked her, could we go and look at that, inspect the drawers?  And so we went to the bedroom together and inspected the drawers.  . . . .  I says, can you remember the last time it was here?  She says, it was about two or three weeks ago is the last time I remember actually seeing it.  And so I says, you're sure?  She says, yes.  I says, have you recognized any aides that was here at the time that the money was missing?  Do you suspect anyone?  . . . .  She says, I don't know.  And then she says, well, there was one particular day when I felt like somebody was near me, but I didn't know who that was.  And I asked her if she could really try to think hard about that.  And she said that she would, but she came back and said I just cannot remember.  I don't know, you know, who that was or, you know, if that even happened.

This testimony is corroborated in large part by the testimonies of Plaintiffs'

witnesses.  Mr. Bailey testified that they talked more in the living room about the

missing money:

> And so that's when Mr. Keith came out and said to me, Sylvester, I didn't really want to tell you this.  . . . .  And he says, well, about six or seven months ago, he says, I was missing some coins.  . . . .  And he says, I believe it was – had to be at least $500.00.  And so I says, Mr. Keith, I says, you are missing coins about six or seven or eight months ago, I says, can you pinpoint exactly when that was?  And

> he says, I know, I cannot pinpoint when or what happened there. And I says, why didn't you report this to me? I says, you know, we can't do anything about it if you don't report this to me. And he says, I did not want to get any of the aides in any trouble. I did not want to make this out of a big deal or anything like that. And I told him, but you have to report things like this. So everything in the same day was reported to [Defendant] Health-Pro, the very same day.

The jury was played the video deposition testimony of Defendant, through Mr. Bailey, and in it Defendant gave the same testimony concerning when it was first informed about the missing money. Plaintiffs' evidence either corroborates Mr. Bailey's testimony, or fails to contradict it. Plaintiffs acknowledge in their appellate brief that they "told [Defendant] Health-Pro about the missing money—from both 2015 and 2016—on the same day, in August 2016." None of Plaintiffs' witnesses could give more than extremely general and broad estimates concerning when the coins were discovered missing, and Mrs. Keith could only state that she believed she had last seen the $1,200.00 two to three weeks prior to discovering it was missing. It is not clear from the evidence when Mrs. Keith actually discovered the money was missing. Plaintiffs' complaint alleges the $1,200.00 "was stolen" in "July or August 2016[.]" Mrs. Keith testified that she believed she saw an aide just outside her room one day as she was removing some cash from her dresser drawer, but she did not know who it was, stating: "all I saw was an arm and at that time, as I said previously, we were having a changeover of personnel. Frankly, I don't remember who was on

what nights." Mrs. Keith testified that Mr. Bailey "seemed very concerned that money went missing from [Plaintiffs'] home[.]"

The only evidence that created a relatively short time period for a possible theft was for the money missing from Mr. Keith's wallet, and that came from Mr. Bailey. According to Mr. Bailey's testimony, Mr. Keith told him he had last seen the money in his wallet on Thursday or Friday, and discovered it missing on Sunday when he was trying to pay for food he had ordered. Defendant wrote "Unknown 2016" in the "Incident Date:" section of its "Incident Report" concerning Plaintiffs' allegations of missing money. The report indicates that Defendant was informed of the missing money on 15 August 2016, which was a Monday. Therefore, if Mr. Bailey was correct about Mr. Keith's statements, and if Mr. Keith was correct in his recollection, the $90.00 would have to have been taken between Thursday, 11 August 2016 and sometime on Sunday, 14 August 2016. Plaintiffs testified they had no reason to suspect Ms. Clark had taken the money from the wallet or from the dresser drawer, and did not produce evidence establishing that Ms. Clark was working on any of these days.

Plaintiffs testified that they had no idea when any of the money was taken, who might have been working when it was taken, and did not identify any of Defendant's aides as suspects. Mr. Bailey testified that Plaintiffs did not want the current aides replaced, but that they were going to cut down on the hours of care provided, so Defendant removed Ms. Clark and Ms. Little, apparently based on the

fact that they had been working for Plaintiffs for a long time, the other two aides working for Plaintiffs were relatively new, so only Ms. Clark and Ms. Little would have been working for Plaintiffs "about six or seven or eight months" prior to 15 August 2016.

Plaintiffs also contend that Defendant's decision to return Ms. Clark to work at their house two to three weeks after she and Ms. Little had been removed from the house is evidence of Defendant's negligence. Mr. Keith testified that the decision to return Ms. Clark to work at Plaintiffs' home was made by Defendant, but he "never felt forced to have Ms. Clark [come] back into [the] home." Mr. Keith testified that he "didn't know that there was any need for" an investigation by Defendant before returning Ms. Clark to work at Plaintiffs' home. Mr. Keith testified concerning the time period that money was taken: "[Ms. Clark] was working there, yes. I don't know if she was in the house when it went missing or not." He was asked: "Is it fair to say that you don't know which aide, if any, took money from the home?" Mr. Keith's answer was: "No, I didn't." He further testified that he was satisfied with the manner in which Defendant handled the issue of the missing money. Plaintiffs both testified that they never had any concerns about Ms. Clark working in their home prior to the events of 29 September 2016, including the period after money disappeared in "July or August." The evidence concerning the missing money at most raised a *possibility* that Ms. Clark, as well as other people, could have had the opportunity to take it. It is not at all clear that she was working for Plaintiffs at the time of the alleged 2015

coins incident, which meant any of the four aides working at Plaintiffs' home in the July to August time period could be equally suspect, as could anyone else who may have spent time in Plaintiffs' home during that time period. The evidence available to Defendant prior to 29 September 2016 implicating Ms. Clark in the alleged disappearance of coins or cash was at best speculative.

This Court has stated that there is no general duty to conduct criminal background checks prior to hiring an employee. *Stanley*, 112 N.C. App. at 612, 436 S.E.2d at 274 ("Although [the employer] admits that it did not do a criminal record check on [the employee], we believe that it did not have a duty to do so. *See, e.g., Evans v. Morsell*, 284 Md. 160, 395 A.2d 480 (1978) (stating that the majority of courts do not recognize a duty to inquire about an employee's criminal record)."). Therefore, our analysis is limited to—considering the context and known facts—did Defendant have a duty to conduct an inquiry before hiring Ms. Clark and, if so, did Defendant exercise due care in conducting the inquiry. *Stanley*, 112 N.C. App. at 612–13, 436 S.E.2d at 274. Further, even if Defendant was "negligent" in its duty to properly vet Ms. Clark for a position that required her to work in clients' homes, no duty would attach to Defendant to protect the injured client unless Ms. Clark's injurious acts were of a kind reasonably foreseeable in light of her particular unfitness for the employment, and the facts demonstrating her unfitness would have been uncovered had Defendant conducted an investigation with reasonable care. This is because an employer's "negligence" in hiring an employee does not create a blanket "duty to

protect" that covers all third parties, irrespective of the surrounding circumstances.[7] That is, Plaintiffs had to prove the necessary duty element of Plaintiff's negligent hiring claim by demonstrating with substantial evidence that *either* Defendant failed to use reasonable care before hiring Ms. Clark, and thereby failed to uncover reasonably knowable facts that made Ms. Clark unfit for that position, *or* Defendant hired Ms. Clark in spite of knowledge of Ms. Clark's unfitness. Further, it was Plaintiffs' duty to prove that, as *a result of the particular unfitness* of Ms. Clark that *Defendant "knew,"* either in fact or constructively, Ms. Clark injured Plaintiffs, and the nature or type of that injury was, in the view of a reasonably prudent person in Defendant's position, *the probable result* of Defendant's lack of due care in hiring and supervising Ms. Clark, in light of *Defendant's knowledge* of her *particular* unfitness.

In this case, Ms. Clark's criminal record included convictions for a few misdemeanors that involved neither theft nor violence. Ms. Clark's application was satisfactory, including two good references. The fact that she checked the box indicating no convictions, even taken as intentionally deceptive, does not seem particularly noteworthy in the context of this case—particularly since Ms. Clark filled out the criminal record check form with her correct information, including social

---

[7] "We refuse to make employers insurers to the public at large by imposing a legal duty on employers for victims of their independent contractors' ["Smith's"] intentional torts that bear no relationship to the employment. We note that . . . the result would be the same if Smith had been an employee of defendants[.] Smith could have perpetrated the exact same crimes against these plaintiffs, in the exact same manner, and with identical chances of success, on a day that he was not selling Omega's meats and driving Omega's vehicle." *Little*, 171 N.C. App. at 588–89, 615 S.E.2d at 49.

security number and N.C. Identification Card number. Owing child support is not disqualifying, in fact, retaining Ms. Clark in employment, better enabling her to meet her obligations, is acting in accordance with good public policy. Further, there does not appear to be any record evidence that Child Social Services ever actually needed to garnish Ms. Clark's wages. The Facebook posts were not evidence the jury could consider to decide any material fact, including Defendant's duty of care—and we find no significant relevance in these posts. Importantly, prior to 29 September 2016 Ms. Clark had worked for Defendant for over a year, had by all accounts done a fine job, was known as quiet and polite—Ms. Clark had established herself as a dependable employee that her clients appeared to like. This record of actual employment with Defendant serves as a substantial counterweight to the relatively minor potential "red flag" evidence Plaintiffs presented at trial.

In light of the events of 29 September 2016, it is easy to assume Ms. Clark did take money from Plaintiffs. However, we are limited to what was or reasonably should have been known to Defendant prior to that date. There was nothing solid from which Defendant would have been able to fairly accuse Ms. Clark of theft. Plaintiffs' testimony shows they did not have any reason to suspect Ms. Clark other than Defendant's attempt to narrow the number of aides that could have been working at Plaintiffs' home during the coin incident alleged to have happened in the fall of 2015 and the events in July or August of 2016. Plaintiffs testify that they assumed Defendant had cleared Ms. Clark prior to returning her to their house.

Defendant states that it did clear her, as much as it reasonably could on the evidence it could procure. Plaintiffs did not feel threatened by Ms. Clark's presence, and everybody who testified concerning their reactions to the news that Ms. Clark had been involved in the 29 September 2016 crime testified that they were completely surprised.

We hold, on these facts, that a reasonably prudent person in Defendant's position, knowing *all* the facts that Plaintiffs introduced about Ms. Clark at trial, available to Defendant prior to 29 September 2016, would not have recognized the "possibility of the intentional" criminal acts of Ms. Clark—that the "risk of foreseeable harm" to Plaintiffs was of the kind that occurred on 29 September 2016, and the risk of [this kind of] harm was so "slight," "that a reasonable [person] in the position of [Defendant] would disregard it." Restatement (Second) of Torts § 302B(d.). Therefore, Defendant had no duty to protect Plaintiffs from Ms. Clark's criminal acts of 29 September 2016.

For the same reasons outlined above, we also agree with Defendant that there was insufficient evidence to take to the jury on the issue of proximate cause because the crime of 29 September 2016 was not a reasonably foreseeable result of any presumed negligence on the part of Defendant. Further, there are specific elements a plaintiff must prove to prevail in a negligent hiring case:

> (1) the specific negligent act on which the action is founded
> . . . (2) incompetency, by inherent unfitness or previous
> specific acts of negligence, from which incompetency may

be inferred; and (3) *either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in 'oversight and supervision,'* . . . and (4) that the injury complained of resulted from the incompetency proved.

*Stanley*, 112 N.C. App. at 611, 436 S.E.2d at 273 (underlining added) (citation omitted). Based on the facts of this case, Defendant could only

> be held liable [for Plaintiffs'] assault[ ] by . . . [Ms. Clark if Defendant] "knew, or in the exercise of reasonable care in the selection . . . of [Ms. Clark] should have known, [Ms. Clark was] likely, by reason of past conduct, bad temper or otherwise, to commit [the] assault, even though the particular assault was not committed within the scope of [Ms. Clark's] employment."

*Id.* (citation omitted). Plaintiffs' evidence was insufficient to demonstrate proximate cause; that, based upon Ms. Clark's past conduct, the events of 29 September 2016, or some similarly serious and violent crime, were likely to occur.

### III. Conclusion

We hold that Plaintiffs' complaint did not include a claim against Defendant based upon the doctrine of *respondeat superior*, and the facts could not support such a claim. We further hold that Plaintiffs' claim was one pursuant to the doctrine of negligent hiring, retention, or supervision, not, as argued by Plaintiffs, one in ordinary negligence. Therefore, the trial court should have granted Defendant's motion for a directed verdict, failing that, should have granted Defendant's request that the jury be instructed in accordance with negligent hiring and, finally, should

have granted Defendant's motion for a JNOV on Plaintiffs' claim for ordinary negligence, because it was not the proper action to prosecute on these facts. Assuming, *arguendo*, Plaintiffs' claim pursuant to ordinary negligence was proper, we hold that Defendant's motion for a JNOV should have been granted based upon insufficient evidence of Defendant's duty to protect Plaintiffs from Ms. Clark's criminal acts and, as the crime was not reasonably foreseeable, Plaintiffs failed to produce sufficient evidence of proximate cause as well. We further hold that there was insufficient evidence of the elements of duty and proximate cause pursuant to a claim for negligent hiring, supervision, or retention, and Defendant's motion for a JNOV should have been granted for that claim as well. As a result, judgment notwithstanding the verdict should have been granted in favor of Defendant on Plaintiffs' negligence claim, under any theory, and we reverse the judgment of the trial court and remand for entry of such an order. Finally, Plaintiffs' cross-appeal was conditioned on this Court remanding for a new trial. Because we have directed the trial court to enter judgment in favor of Defendant, Plaintiffs' cross-appeal concerning the issue of punitive damages is moot and, therefore, dismissed.

REVERSED AND REMANDED; CROSS-APPEAL DISMISSED.

Judge ZACHARY concurs.

Judge DILLON dissents with separate opinion.

DILLON, Judge, dissenting.

The majority concludes that the verdicts/judgments in favor of Plaintiffs must be reversed and that Defendant was entitled to judgment as a matter of law. I disagree.

It was *not* reversible error for the trial court to allow the case to be presented as one in "ordinary negligence," where Defendant argues that the case should have been characterized more specifically as one in "negligent retention." Though Plaintiffs allege that Defendant was negligent in retaining Ms. Clark, evidence of negligent retention is merely a means by which a plaintiff proves ordinary negligence. As such, negligent retention (like any other ordinary negligence claim) requires a plaintiff to show that the defendant owed a duty, that the defendant breached that duty, and that the plaintiff suffered an injury proximately caused by the breach.

And the evidence, *when viewed in the light most favorable to Plaintiffs*, was sufficient to make out an ordinary negligence claim based on their evidence of Defendant's negligent retention of a dishonest employee. The crux of the majority's analysis is based on its conclusion that Plaintiffs were *required* to show that the robbery occurred while the dishonest employee was on duty. I do not believe this to be a hard and fast rule. Rather, I conclude that an employer may still be held liable for negligent retention when its dishonest employee uses "intel" learned while on duty to facilitate a theft, though waits until off-duty to commit the theft. Here, it should not matter here that Defendant's dishonest employee did not rob Plaintiffs while on

duty, but rather waited to be off-duty to use her knowledge gained based on her employment of the location of a key to Plaintiffs' home hidden outside, the location of Plaintiffs' valuables within the home, and the times when the vulnerable Plaintiffs would be alone to facilitate the commission of the robbery.

Accordingly, my vote is "no error." The jury's verdict should be sustained.

### Discussion

The facts of the case are relatively straight-forward.

Plaintiffs Mr. and Mrs. Keith are an elderly couple living in their own home. In 2012, they contracted with Defendant Health-Pro to employ qualified people to provide care to them in their home.

In 2015, Deitra Clark was employed by Defendant to serve as a caregiver and was assigned to Plaintiffs' home. She performed her caregiving services well. However, shortly after she was assigned to Plaintiffs' home, money belonging to Mr. Keith went missing. Months later, on two other occasions, while she remained assigned to Plaintiffs' home, more of Plaintiffs' money went missing. After working for about a year, Ms. Clark used her knowledge of Plaintiffs and their home to facilitate a break-in of the home and subsequent robbery.

Plaintiffs commenced this action against Defendant seeking damages suffered from the break-in/robbery, alleging that Defendant was negligent in continuing to

assign Ms. Clark to their home and that this negligence was a proximate cause of their damages.

### I. Ordinary Negligence vs. Negligent Retention

The majority concludes that it was error to allow Plaintiffs to characterize their claim as an ordinary/common law negligence claim, rather than as a negligent retention claim. *See Adams v. Mills*, 312 N.C. 181, 187, 322 S.E.2d 164, 169 (1984) (describing the tort as "ordinary common law negligence").) I disagree.

To make out a claim for ordinary negligence, "a plaintiff must [show]: (1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." *Stein v. Asheville City Bd. of Educ.,* 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006).

Our Supreme Court has long characterized a claim alleging negligent retention as an ordinary negligence claim. For instance, nearly a century ago, our Supreme Court held that a claim based on evidence of negligent retention of an incompetent employee "was sufficient to [reach] the jury as to [the] right of plaintiff to recover at common law for negligence." *Johnson v. R.R.,* 191 N.C. 75, 80, 131 S.E. 390, 393 (1926). The Court characterized "[t]he action brought by [the] plaintiff [in that case] was a common-law action for negligence[,]" *id.* at 79, 131 S.E. at 392, recognizing that the employer had a duty "to see that those admitted to and retained in his service are fitted for the duties imposed upon them, the measure of responsibility being the exercise of ordinary or reasonable care." *Id.* at 80, 131 S.E. at 393.

More recently, our Supreme Court again characterized a claim for negligent retention as a "common law negligence" claim. *See Craig v. New Hanover Cty. Bd. of Educ.*, 363 N.C. 334, 335-36, 678 S.E.2d 351, 353 (2009).

Common law negligence differs from other distinct forms of negligence by the proof that may be required. For example, gross negligence requires additional proof of an "intentional wrongdoing or deliberate misconduct[,]" by the defendant. *Ray v. N.C. DOT*, 366 N.C. 1, 13, 727 S.E.2d 675, 684 (2012). But as a type of ordinary negligence, a plaintiff alleging negligent retention must merely show that the defendant owed plaintiff a <u>duty</u>, that the defendant <u>breached</u> this duty, and that this breach was a <u>proximate cause</u> of some injury suffered by the plaintiff. And as explained in the next section, I conclude that Plaintiffs met their evidentiary burden.

II. Sufficiency of Plaintiffs' Evidence for Actionable Negligence

The majority concludes that Plaintiffs failed to offer sufficient evidence on either ordinary negligence or negligent hiring. I disagree. As stated above, negligent hiring is merely a theory by which a plaintiff proves ordinary negligence.

A. Duty

Defendant clearly owed Plaintiffs, an elderly couple in poor health, a **duty** to exercise reasonable care in providing caregivers who were *not only* competent in providing for their physical needs, *but also* who were honest and not likely to take advantage of their position of trust to steal from Plaintiffs. Defendant knew that its

caregivers would have wide access to its clients' homes and that its clients were vulnerable to being taken advantage of by dishonest caregivers.

The majority relies, in large part, on its conclusion that Defendant owed no legal duty to Plaintiffs for any harm Ms. Clark caused them *when she was not on the clock*. The majority relies on *Little v. Omega Meats I, Inc.,* 171 N.C. App. 583, 615 S.E.2d 45 (2005), to support this conclusion. I conclude that the majority misreads *Little* as *requiring* that the employee to be on-duty as an essential element of every negligent retention claim.

In *Little*, an employer hired a dishonest person to deliver meat from a truck to the employer's clients. The dishonest employee drove into a neighborhood, parked the truck in a customer's driveway; but then proceeded to break into the house of a neighbor *who was not a customer or prospect of the employer*. *Id.* at 584, 615 S.E.2d at 47. We held that even assuming the employer knew its employee was dishonest, the employer could not be held liable for the break-in of the neighbor's home. We reasoned that the employer owed no duty *to the neighbor* because its employment relationship with its dishonest employee had nothing to do with the break-in. *Id.* at 589, 615 S.E.2d at 49. Specifically, we so held based on the facts of that case because:

> (1) the employee "was not in a place where he had a legal right to be [when] he broke [into the] plaintiffs' home";
>
> (2) the employee "and plaintiffs did not meet as a direct result of [the employee's] relationship with defendants" and "did not enter plaintiffs' home as a salesman";

> (3)      the defendant-employers "received no benefit, direct, indirect or potential, from the tragic 'meeting' between [the employee] and plaintiffs."

*Id.* at 588, 615 S.E.2d at 49.

The present case is distinguishable from *Little*. Here, the harm to Plaintiffs (the break-in) had everything to do with Ms. Clark's employment relationship with Defendant, though it happened when she was off-duty. Plaintiffs and Ms. Clark *met* as a direct result of her employment with Defendant. And though Ms. Clark was off-duty and had no right to be in Plaintiffs' home when the break-in occurred, Ms. Clark used "intel" she learned while she *on the clock* to target Plaintiffs and to facilitate the break-in. (This "intel" is explained more fully in subsection C. below concerning the "proximate cause" element). And Defendant otherwise received a benefit – being paid large sums of money by Plaintiffs – from Ms. Clark working in Plaintiffs' home, when she gained the "intel."

The majority's rigid interpretation of *Little*, that the harm in every negligent retention case *must* occur when the employee is "in a place where he had the right to be," would lead to illogical results. For example, based on the majority's logic, Defendant would have been subject to liability *only if* Ms. Clark had let her accomplices in and showed them where valuables were hidden *while on duty*. But, Defendant escapes liability simply because Ms. Clark and her accomplices waited for

her to be off duty to use her intel to gain entry and to locate Plaintiffs' valuables. Or

consider the following example:

> Assume a restaurant retained a parking valet it knew was a car thief, and assume the valet stole the car of a patron. Based on the majority's reasoning, the restaurant would be subject to liability for negligent retention *only if* the valet stole the car <u>while on duty</u>. The restaurant, would not be liable, though, if the valet merely made a copy of the patron's car key while on duty, as the patron dined, and then waited until he was off-duty to use that key to steal the car.

*Little* would be applicable if Ms. Clark and her accomplices had broken into the house

of the Plaintiffs' next-door neighbor, to whom Defendant owed no duty and about

whom Ms. Clark would not have gained intel simply based on her employment. In

the same way, if the valet in my example did not make a key but had hot-wired the

patron's car when off duty, perhaps the restaurant would not be liable, as there would

be no connection between the valet's employment and the theft.

### B. Breach

Defendant had a duty to Plaintiffs to exercise reasonable care to see that its

caregivers were not the type who would likely to take advantage of their access to the

lives and homes of Defendant's clients. There was sufficient evidence, when viewed

in the light most favorable to Plaintiffs, that Defendant **<u>breached this duty</u>** it owed

to Plaintiffs by allowing Ms. Clark to continue working in Plaintiffs' home: There

was evidence which suggested that Defendant should have known that Ms. Clark was

dishonest *and* capable of the robbery, perhaps not in September 2015 when she was

initially hired by Defendant, but certainly a year later by mid-September 2016, weeks before the break-in.  By that time, Defendant knew that Ms. Clark had lied on her job application about her criminal past; that she was having on-going money troubles; that money had gone missing in Plaintiffs' homes on three separate occasions, all after Ms. Clark was assigned there; and that Ms. Clark was one of only two caregivers likely to have been the culprit.  Specifically, it could be inferred from the evidence, viewed in the light most favorable to Plaintiffs, that:

> In 2012, Defendant contracted with Plaintiffs to provide caregivers.
>
> Three years later, in September 2015, Ms. Clark was hired by Defendant as a caregiver and was assigned to Plaintiffs' home.  <u>Up to that time, nothing had been reported stolen by Plaintiffs</u>.  Defendant learned at some point before the break-in that Ms. Clark had lied on her job application about having no criminal history.
>
> In October 2015, only a month after Ms. Clark began working in the Plaintiffs' home, several hundred dollars in rolled coins belonging to Plaintiffs' went missing, though Defendant was not immediately notified.
>
> In May 2016, Defendant learned that Ms. Clark was having money problems:  Defendant, as Ms. Clark's employer, was notified by Pitt County that Ms. Clark was in arrears in child support payments.
>
> Three months later, in August 2016, Plaintiffs met with Ms. Clark's supervisor and first reported the October 2015 theft.  Plaintiffs also reported that $90.00 had *recently* been taken from Plaintiff, Mr. Keith's wallet and $1,200.00 had *recently* been taken from Plaintiff, Mrs. Keith's dresser.  Ms. Clark's supervisor concluded that if a caregiver had stolen the money, it was likely either Ms. Clark or one other certain caregiver.  Each, though, when questioned, denied stealing from Plaintiffs.

> After learning of the three thefts, Defendant removed Ms. Clark from Plaintiffs' home. But weeks later, Defendant again placed Ms. Clark in Plaintiffs' home, signaling to them that Defendant had used reasonable diligence to determine that Ms. Clark was not the thief.
>
> By letter dated 9 September 2016, shortly after Ms. Clark was re-assigned to Plaintiffs' home, Defendant was again notified that Ms. Clark was again delinquent on paying child support. Defendant, though, continued assigning Ms. Clark to work in Plaintiffs' home without raising any concern to Plaintiffs.

Three weeks later, Ms. Clark participated in the break-in of Plaintiffs' home, in which well over $1,000.00 was stolen from Plaintiffs.

There are cases suggesting that an employer breaches its duty to exercise reasonable care to provide honest caregivers by failing to conduct a criminal background check or by knowledge of minor crimes in the remote past. However, the issue here is not Ms. Clark's criminal record itself, but rather that Defendant knew Ms. Clark *had lied* on her job application about it. This lie put Defendant on notice that Ms. Clark was not an honest person. And while knowledge of the lie, by itself, might not have constituted a breach, it along with Defendant's knowledge of the three thefts and that Ms. Clark, a woman who had lied on her job application and who was having money troubles, was one of two suspects were enough to reach the jury on this issue. Reasonable minds can differ as to whether continuing to place Ms. Clark in Plaintiffs' home with all this knowledge was sufficient to constitute a breach. The jury made its call.

### C. Proximate Cause

The evidence was sufficient for the jury to infer that Defendant's breach of duty was a **proximate cause** of the break-in. Plaintiff's evidence showed that Ms. Clark used information learned *while on the job* to target Plaintiff's home and facilitate the break in/robbery:

> That Plaintiffs were advanced in age and not in good health and, therefore, easy targets for a robbery.

> The location of a key to Plaintiffs' home hidden outside in an obscure location, allowing the perpetrators to gain entry quietly, without any warning or causing any neighborhood disturbance.

> The location of Mr. Keith's gun, allowing the perpetrators to grab the gun before Plaintiffs could get to it to defend themselves.

> That no one would be with Plaintiffs after 11:00 p.m., after the last caregiver left for the day.

> The location of hundreds of dollars in rolled coins belonging to Mr. Keith hidden in an obscure location within the home, allowing the perpetrators to steal quickly.

> That Mr. Keith had a car, could still drive, and had a bank card from which he could access money from his account, allowing the perpetrators, who did not have a car during the robbery to force Mr. Keith to drive one of them to his bank and withdraw $1,000.00.

There may have been other proximate causes. But as our Supreme Court has instructed, "[w]hen two or more proximate causes join and concur in producing a result complained of, the author of each cause may be held for the injuries inflicted." *Hairston v. Alexander*, 310 N.C. 227, 234, 311 S.E.2d 559, 566 (1984).

Defendant argues that there was no proximate cause since it was not "foreseeable" that Ms. Clark would participate in an aggressive robbery. Indeed, our Supreme Court has held that "[f]oreseeability is [ ] a requisite of proximate cause." *Id.* at 233, 311 S.E.2d at 565.

But our Supreme Court also instructs that (1) "the test of foreseeability [ ] does not require that defendant should have been able to foresee the injury *in the precise form* in which it actually occurred" and (2) "the law of proximate cause does not always support the generalization that the misconduct of others is unforeseeable. The intervention of wrongful conduct of others may be the very risk that defendant's conduct creates." *Id.* at 233-34, 311 S.E.2d at 565 (emphasis added). And whether a defendant's negligence was a "proximate cause of an injury is ordinarily a question for the jury." *Short v. Chapman*, 261 N.C. 674, 680, 136 S.E.2d 40, 45 (1964).

There was enough evidence here from which the jury could infer that it was foreseeable that: (1) a dishonest caregiver might take advantage of the access and information she would gain due to the nature of the job; (2) Ms. Clark, if she was the culprit of the earlier thefts, might steal again, given that she was having money troubles; and (3) Ms. Clark might wait to be off duty to steal again, which would require a break-in, since she was recently under suspicion for the earlier thefts.[8]

---

[8] Defendant cites *Williamson v. Liptzin*, 141 N.C. App. 1, 539 S.E.2d 313 (2000), to support its contention that Plaintiffs' injuries were not foreseeable. However, the facts in *Williamson*, where we concluded that there was no proximate cause as a matter of law, are easily distinguishable. In

### III. Jury Instructions

I disagree with the majority's contention that the trial court committed reversible error by giving certain jury instructions.

Defendant argues in its brief that the trial court erred in instructing the jury on the "duty" element.

The trial court gave North Carolina Pattern Jury Instruction 102.11, which describes "duty" generally, as follows: "Every person is under a duty to use ordinary care to protect himself and others from injury. Ordinary care means that degree of care which a reasonable and prudent person would use under the same or similar circumstances to protect himself or others from injury." N.C.P.I. Civil 102.11.

Defendant argues in its brief that the trial court should have given the following, more detailed instruction on "duty," which it requested and which closely tracks language in *Little*:

> The plaintiff must prove that the defendant owed plaintiff a legal duty of care. This means that the plaintiff must prove that [the employee] and the plaintiff were in places where each had a right to be when the wrongful act occurred, that the plaintiff encountered [the employee] as a direct result of his employment by the defendant, and that the defendant must reasonably have expected to receive some benefit, even if only potential or indirect, from the encounter between (the employee) and the plaintiff.

---

*Williamson*, the plaintiff, who had killed two people during a psychotic episode, sued a psychiatrist who had treated him *several months earlier* at a time when his psychosis was under control due to medication. We held that the shooting was unforeseeable because it was too remote in time from the defendant's treatment and there was no evidence that a professional could have predicted the plaintiff's violent acts.

Defendant contends that the jury should have been instructed that "[w]hether the relevant individuals were in places where they had a right to be . . . is relevant to this matter" as this matter is a negligent retention case.

The trial court's actual instruction was a correct statement of the law in this case, as Plaintiffs claim was one in ordinary negligence. But it would not have necessarily been inappropriate for the trial court to expound on some of the elements, provided the requested instructions were a correct statement of the law as supported by the evidence. I disagree, though, that the instruction on duty requested by Defendant, though maybe appropriate in certain negligent retention cases, would have been appropriate in this case. No one disputes that the "wrongful act" occurred when Ms. Clark had no right to be in Plaintiffs' home. However, as explained above, it was enough for Plaintiffs to show that Ms. Clark used intel learned while she was on the job to facilitate the robbery which occurred after she had left work for the day. Accordingly, the instructions requested by Defendant would have confused the jury. If followed by the jury, the instructions would have necessarily resulted in a verdict for Defendant. In fact, if the instructions were an accurate statement of the law, as applied to the evidence in this case, then Defendant would have been entitled to judgment as a matter of law. Based on the requested instructions, Defendant owed no duty to Plaintiffs *solely* because the robbery occurred when Ms. Clark was off the clock, and therefore could not be held liable, notwithstanding that Defendant had

been negligent in continuing to place Ms. Clark in Plaintiffs' home, that Ms. Clark provided the intel learned while placed in Plaintiffs' home to the perpetrators to facilitate the break-in, that it was foreseeable that Ms. Clark would try and steal from Plaintiffs again, and that the break-in would not have otherwise occurred.

Also, I conclude that Defendant failed to meet its burden to show that the jury was "likely misled" by the instructions which were actually given. *Coppick v. Hobbs*, 240 N.C. App. 324, 334, 772 S.E.2d 1, 9 (2015). It is unlikely that the jury did not understand the case before it — that it did not find for Plaintiffs based on anything other than its determination that Defendant owed Plaintiffs a duty to provide honest caregivers, that Defendant breached this duty by continuing to place Ms. Clark in Plaintiffs' home, despite their knowledge about her, and that it was the information that Ms. Clark learned through her employment about Plaintiffs that caused Plaintiffs to be targeted and facilitation of the break-in.

Reasonable minds can differ regarding Defendant's liability for the criminal conduct of its employee Ms. Clark towards its client. But the jury has spoken in this case, and my vote is to honor their verdict.